**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-2526
_____

DEVIN JEFFERSON,
Appellant

v.

OFFICER GEORGE LIAS; CITY OF ELIZABETH
_____

On Appeal from the United States District Court
for the District of New Jersey
(District Court No. 2:15-cv-01086)
District Judge: Honorable Michael A. Hammer
_____

Argued: May 20, 2021
_____

Before: McKEE, RESTREPO, and FUENTES, *Circuit Judges*

(Filed: December 16, 2021)

Daniel Ginzburg [ARGUED]
Unit 736
151 Highway 516
Old Bridge, NJ 08857

   *Counsel for Appellant Devin Jefferson*

Daniel Antonelli [ARGUED]
Antonelli Kantor

354 Eisenhower Parkway
Suite 1000
Livingston, NJ 07083

*Counsel for Appellee George Lias*

Robert F. Varady [ARGUED]
LaCorte Bundy Varady & Kinsella
989 Bonnel Court
Union, NJ 07083

*Counsel for Appellee City of Elizabeth*

_____

OPINION OF THE COURT
_____

RESTREPO, *Circuit Judge*.

This appeal involves claims arising out of a police shooting that occurred during the course of a car chase. Appellant Devin Jefferson challenges the District Court's grant of summary judgment against his Fourth Amendment excessive force and *Monell* failure-to-train claims, brought against Appellees Officer George Lias and the City of Elizabeth, respectively. The District Court determined that Officer Lias was entitled to qualified immunity, and moreover that Jefferson suffered no constitutional injury, leaving no basis for his *Monell* claim. For reasons we will explain below, we will reverse the District Court's order with respect to both claims and remand for further proceedings in accordance with this opinion.

**I.**

**A. Background**

The events in question took place on January 15, 2014, as Jefferson was driving home from a concert venue in Elizabeth, New Jersey. Officer Timothy Staffer of the Elizabeth

Police Department, on patrol in his cruiser that night, took notice of Jefferson traveling at a high speed with his car alarm blaring. Jefferson, playing music loudly in his car, was apparently oblivious to the alarm. Officer Staffer, suspecting the vehicle may have been stolen, turned to follow Jefferson and activated his siren and overhead lights in an attempt to pull over the vehicle. As it so happened, Jefferson was approaching the end of a five-year probation term and was driving with an open container of alcohol in the car. Fearing a probation violation, Jefferson did not pull over for Officer Staffer, and a car chase ensued.

Officer Lias, also on duty that night, eventually joined the pursuit of Jefferson after hearing radio dispatches concerning the activity. At the time Lias joined the pursuit, he was only aware of the information that had been communicated over the radio, namely that Jefferson was driving a possibly stolen vehicle, the vehicle's license plate number, and the direction it was headed. Although other officers during the pursuit "observed Mr. Jefferson traveling at high speeds, running red lights, ignoring police signals to pull over, and driving in close proximity to other vehicles," Lias did not personally witness Jefferson running red lights or weaving in and out of traffic. Lias Br. 5.

Near the end of the pursuit, Jefferson was traveling northbound on Jefferson Avenue when he made a right turn on Mary Street, hitting a fire hydrant. Officers then surrounded Jefferson's vehicle on both left and right sides. To evade the officers, Jefferson reversed, first striking a police vehicle before backing up onto the intersection of Jefferson Avenue and Mary Street, attempting to turn back onto Jefferson Avenue from the direction he had arrived. Lias arrived at the scene in his vehicle as Jefferson was in the process of completing his maneuver in the intersection. He had not personally witnessed Jefferson striking either the fire hydrant or the police vehicle.

3

Both parties characterize the following moments, which culminated in Lias shooting Jefferson, in different terms. According to Jefferson, as he finished reversing from Mary Street and began to proceed forward onto Jefferson Avenue, "Lias exited from the front passenger door of his vehicle, maneuvered around the hood of his car toward Plaintiff's vehicle, and settled into a shooting position. Officer Lias discharged his firearm at Plaintiff as Plaintiff's vehicle passed in front of him . . . Prior to shooting, Officer Lias did not see any police officers attempt to escape Plaintiff's vehicle path." Appellant Br. at 5. In Officer Lias' telling, "[i]n the last split second as Mr. Jefferson was passing Officer Lias's police car, Officer Lias discharged his firearm once at Mr. Jefferson's vehicle because he testified that he feared for his own safety and others around him, including other officers and Officer Banos who he did not know where he was at the time but knew he was in the area." Lias Br. at 6. The record contains video footage depicting the shooting obtained from a utility pole.

Jefferson was struck in his left forearm, fracturing the bones there. After he was hit, Jefferson continued to drive away and checked himself into the hospital. Jefferson was eventually indicted in New Jersey State Court for second-degree eluding, and ultimately pled guilty to the charge.

## II. DISCUSSION[1]

On February 4, 2015, Jefferson initiated an action bringing two 42 U.S.C. § 1983 claims: one against Officer Lias for

---

[1] The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. We review *de novo* the District Court's grant of summary judgment. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016). "Viewing the evidence in the light most favorable to the nonmovant, summary judgment is appropriate only if there is 'no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law.'" *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010) (quoting *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009)); Fed. R.

4

excessive force under the Fourth Amendment, and the other against the City of Elizabeth under a *Monell* failure to train theory of liability.[2]  After discovery, both parties moved for summary judgment, which the District Court granted on June 30, 2020, in favor of Appellees.  The District Court held that Officer Lias's use of deadly force was reasonable under the circumstances, but even assuming it was not, that he was shielded from liability by qualified immunity because his actions did not violate clearly established law.  Further, because it found there was no underlying constitutional violation, the District Court determined that Jefferson's *Monell* claim against the City of Elizabeth failed as a matter of law.  We will begin our analysis with a discussion of the standards governing excessive use-of-force claims.

### A. Officer Lias's use of force was not "reasonable" as a matter of law under the Fourth Amendment

Claims of excessive force against law enforcement officers brought by persons outside of police custody are analyzed under the Fourth Amendment.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  "To prevail on a Fourth Amendment

---

Civ. P. 56(a).  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[2] In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978), the Supreme Court held that a municipal government may be liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" alleged by the plaintiff.  In subsequent cases defining the scope of *Monell* liability, the Court explained that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure-to-train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

excessive-force claim, a plaintiff must show that a seizure occurred and that it was unreasonable under the circumstances." *El v. City of Pittsburgh*, 975 F.3d 327, 336 (3d Cir. 2020) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 182-83 (3d Cir. 2011)).  Jefferson's shooting undoubtedly constituted a seizure.  *Torres v. Madrid*, 141 S. Ct. 989, 999 (2021) (officers seized fleeing suspect by shooting and hitting her, although she eluded capture).  The relevant inquiry thus is whether Lias's use of force was reasonable under the circumstances.

Determining whether force used in a given instance is reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396 (quotations and citations omitted).  Moreover, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id*.  The inquiry is an objective one, however, and "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id*. at 397.  In *Tennessee v. Garner*, the Supreme Court held that deadly force is not justified in circumstances where a fleeing suspect "poses no immediate threat to the officer and no threat to others."  471 U.S. 1, 11 (1985).

As this Court noted, additional

> [f]actors to consider in making a determination of reasonableness include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he actively is resisting arrest or attempting to evade arrest by flight.

*Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004) (citing *Graham*, 490 U.S. at 396). Other relevant factors are "the physical injury to the plaintiff, the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *El*, 975 F.3d at 336 (quotation and citation omitted). Because the inquiry is so fact-dependent, we have held that "[t]he reasonableness of the use of force is normally an issue for the jury." *Rivas*, 365 F.3d at 198 (citing *Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999)); *see also Lytle v. Bexar Cty.*, 560 F.3d 404, 411 (5th Cir. 2009) (noting in "cases where the officer's conduct is less clear and an assessment of reasonableness mandates a number of factual inferences, the case falls within the province of a jury").

In its opinion, the District Court did not explicitly discuss any of the factors articulated in *Garner* or *Graham*. Nor did it discuss our precedent interpreting and applying *Graham*'s "reasonableness" standard. Without making reference to those decisions, the Court, at the end of its qualified immunity analysis, determined that Officer Lias's use of force was reasonable, depicting the circumstances involved in the following manner:

> Plaintiff was engaged in a high-speed car chase with the police. Officer Lias saw Plaintiff's vehicle driving recklessly, reversing into an intersection, and then driving towards Officer Lias and his police cruiser. Officer Lias testified that when he saw the oncoming vehicle he feared for his safety, the safety of his partner, and other officers. In a matter of mere seconds, Plaintiff's vehicle straightened out to avoid hitting Officer Lias's police cruiser.

7

App. 10. In viewing the record in the light most favorable to the nonmoving party, as we must do at summary judgment, combined with our presumption that the "reasonableness" of an officer's use of force is typically best left to a jury to determine, we are not persuaded that the District Court's conclusion here was proper. For instance, upon reviewing the video footage, a jury could very well accept Lias's and the District Court's contention that Jefferson "straightened out to avoid hitting Officer Lias's police cruiser" in a matter of "mere seconds." *See id.* However, it could also determine that Lias was not in danger of being struck by Jefferson's car as Jefferson was in the course of passing him, and that Lias's decision to shoot through Jefferson's driver's side window was not justified by any objective threat that Jefferson posed to him or others in the area.

We were confronted with a very similar and instructive set of circumstances in *Abraham*, 183 F.3d at 282. In that case, an off-duty police officer, Raso, shot and killed an individual, Abraham, who was attempting to flee in his car from a Macy's from which he had shoplifted merchandise. *Id.* Multiple issues were disputed, including where exactly the officer was positioned vis-à-vis the vehicle in the moments leading up to and during the shooting; how chaotic the pursuit had been prior to that moment; how quickly Abraham accelerated once in his car; and whether the officer was in danger of being run over by Abraham. *Id.* at 283-85. However, despite the lack of clarity in the record as to where exactly the officer was standing when the bullet was fired, the "shot indisputably came through the driver's side window." *Id.* at 293.

The officer moved for summary judgment against Abraham's estate and the district court granted her motion, reasoning that "regardless of whether Raso's use of deadly force was justifiable in self-defense, Abraham posed an immediate threat of physical harm to the public, making the shooting objectively reasonable." *Id.* at 282. We refused, however, to adopt the district court's assessment on summary judgment that

8

Abraham posed a threat to the public based on its conclusory characterization of his attempt to flee:

> According to the District Court, Abraham "recklessly" drove in reverse at "a high rate of speed" with people in "close proximity" before he "rammed" into a parked car. A jury may ultimately accept this version of the facts, but it also may not.

*Id*. at 292. Moreover, in assessing the fear that Raso claimed she experienced on her own behalf, separate from the alleged threat posed by Abraham toward the public, we further explained that "the ultimate question is not whether Raso really was in danger as a matter of fact, but is instead whether it was objectively reasonable for her to believe that she was. A jury will have to determine, after deciding what the real risk to Raso was, what was objectively reasonable for an officer in Raso's position to believe about her safety, giving due regard to the pressures of the moment." *Id.* at 294.

Just like in *Abraham*, the District Court here engaged in an analogous weighing of the evidence in determining that Jefferson "presented a danger to those in the area" based on his escape. App. 11. We see no reason to depart from the standard course established by our precedent in this case. As we decided in *Abraham*, a jury ought to have the opportunity to make factual determinations regarding Officer Lias's decision to employ deadly force against Jefferson.

### B. Officer Lias is not entitled to qualified immunity

The District Court further concluded that, even assuming Officer Lias's use of force was objectively unreasonable under the Fourth Amendment, his actions did not violate "clearly established" law such that he is entitled to qualified immunity. We disagree.

"Police officers, embodying the authority of the state, are liable under § 1983 when they violate someone's constitutional rights, unless they are protected by qualified immunity." *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021) (quoting *Santini v. Fuentes*, 795 F.3d 410, 416-17 (3d Cir. 2015)). Our review of a district court's grant of summary judgment based on qualified immunity is *de novo*. *Id*. at 164. Moreover, the officer bears the burden of establishing his entitlement to qualified immunity at summary judgment. *Id*. at 165 (citing *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014)). The qualified immunity inquiry contains two prongs: (1) whether the facts alleged by the plaintiff show the violation of a constitutional right, and (2) whether the law was clearly established at the time of the violation. *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010). We will focus our analysis on the second prong, as the District Court found it determinative in holding that Officer Lias was entitled to qualified immunity.

Recently, in *Peroza-Benitez*, we articulated how we should determine whether a right was clearly established at the time of the violation:

> To determine whether a right was "clearly established," we conduct a two-part inquiry. First, we must define the right allegedly violated at the appropriate level of specificity. This requires us to frame the right in light of the specific context of the case, not as a broad general proposition. Second, we must ask whether that right was "clearly established" at the time of its alleged violation, *i.e.*, whether the right was sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is an objective (albeit fact-specific) question, where an officer's subjective beliefs . . . are irrelevant.

10

*Peroza-Benitez*, 994 F.3d at 165 (citations and some quotations omitted).

Jefferson would have us define the constitutional right as one that "bars an officer from opening gunfire into the driver's side window of a fleeing vehicle passing in front of him if the driver is not believed to be armed, did not previously act in a menacing manner, and if there is no immediate danger to the officer or bystanders." Appellant Br. at 42. Lias, for his part, would define the right at a much higher level of generality, contending that it is not a violation of a clearly-established constitutional right to "shoot[] at a fleeing driver to protect those who his or her flight might endanger." Lias Br. at 19. We would not define the right as narrowly as Jefferson would, but neither would we adopt so broad a formulation as Lias. Instead, we will define the right as follows: a suspect fleeing in a vehicle, who has not otherwise displayed threatening behavior, has the constitutional right to be free from the use of deadly force when it is no longer reasonable for an officer to believe his or others' lives are in immediate peril from the suspect's flight.

With respect to determining whether this right was "clearly established" at the time of the shooting, we first turn "to factually analogous Supreme Court precedent, as well as binding opinions from our own Court." *Peroza-Benitez*, 994 F.3d at 165 (citing *Fields v. City of Phila.*, 862 F.3d 353, 361 (3d Cir. 2017)). Following that, we determine whether there exists a "robust consensus of cases of persuasive authority in the Courts of Appeals." *Fields*, 862 F.3d at 361 (quoting *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 247– 48 (3d Cir. 2016)). "We may also take into account district court cases, from within the Third Circuit or elsewhere." *Peroza-Benitez*, 994 F.3d at 165-66. Conducting that review, in our view, this right was "clearly established" at the time of the shooting in this case by *Abraham*, where we held in a factually analogous context that "[a] passing risk to a police officer is not an ongoing

11

license to kill an otherwise unthreatening suspect." *Abraham*, 183 F.3d at 294; *accord Lamont*, 637 F.3d at 184.[3]

Other Courts of Appeals to have considered actions where officers have used deadly force against non-dangerous suspects attempting to evade arrest while driving have ruled in parallel. In *Waterman v. Batton*, 393 F.3d 471 (4th Cir. 2005), the Fourth Circuit granted qualified immunity to officers who shot and killed a fleeing driver as he sped toward them. Even in doing so, however, the Court drew a distinction between officers' decision to fire at the decedent while he approached and their continued shooting after he had passed them. Citing our decision in *Abraham*, it held that "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated."

---

[3] The District Court determined that *Abraham* was irrelevant to its discussion of qualified immunity because the issue was not raised in that case. It cited two of our non-precedential opinions, *Thompson v. Howard*, 679 F. App'x 177, 183-84 (3d Cir. 2017), and *Martin for Estate of Webb v. City of Newark*, 762 F. App'x 78, 84 (3d Cir. 2018), in which we found that officers were entitled to qualified immunity for their use of deadly force against drivers attempting to escape arrest, and that *Abraham* did not compel a contrary result. In two other non-binding decisions, however, we have relied on *Abraham* in determining that it is "clearly established" that the use of deadly force against fleeing felons that do not pose a threat to officers or others is unreasonable. *See Zion v. Nassan*, 556 F. App'x 103, 109 (3d Cir. 2014) (noting based on *Abraham* that it would be "premature to grant the defendants qualified immunity" where pleadings contain allegations that an officer shot "directly at a driver who is coming toward an officer when the officer has the opportunity to move out of the way"); *Eberhardinger v. City of York*, 782 F. App'x 180, 183, 184 (3d Cir. 2019) (noting that *Abraham* "clearly established that Officer Smith's conduct, as alleged by Eberhardinger, violated her Fourth Amendment rights" where allegations were that "Smith—standing to the left of the slow-moving vehicle and apparently out of harm's way—fired four shots at the driver as the vehicle was passing him or had completely passed him").

*Waterman*, 393 F.3d at 481. Nevertheless, it determined that the officers were entitled to qualified immunity at that time because such a right had not yet been clearly established in their circuit. *Id.* at 482. The Fourth Circuit has subsequently held, however, that *Waterman* served to "clearly establish" the following: "(1) law enforcement officers may—under certain conditions—be justified in using deadly force against the driver of a car when they are in the car's trajectory and have reason to believe that the driver will imminently and intentionally run over them, but (2) the same officers violate the Fourth Amendment if they employ deadly force against the driver once they are no longer in the car's trajectory." *Williams v. Strickland*, 917 F.3d 763, 770 (4th Cir. 2019) (denying qualified immunity to officers that allegedly shot at driver because they were no longer in his vehicle's trajectory).

The Fifth Circuit reached a similar conclusion in *Lytle v. Bexar County*, 560 F.3d 404 (5th Cir. 2009), again citing *Abraham* along with cases in other circuits to hold that "a suspect that is fleeing in a motor vehicle is not so inherently dangerous that an officer's use of deadly force is *per se* reasonable." 560 F.3d at 416. There, it denied qualified immunity to an officer where the officer allegedly fired upon a fleeing motorist from a distance standing to the rear and no bystanders were in the path of the vehicle. *Id.* at 407-08.

The Sixth, Ninth, Tenth, and Eleventh Circuit Courts of Appeals have issued analogous decisions. *See, e.g.*, *Kirby v. Duva*, 530 F.3d 475, 483 (6th Cir. 2008) (holding "deadly force cannot be used against an escaping suspect who does not pose an immediate danger to anyone" and denying qualified immunity where officer allegedly approached slow-rolling vehicle and fired upon driver); *Adams v. Speers*, 473 F.3d 989, 993 (9th Cir. 2007) (holding no reasonably acting officer "could have believed that he could use deadly force to apprehend" fleeing driver after stepping out of patrol vehicle and shooting driver without warning or need for self-defense); *Reavis v. Frost*, 967 F.3d 978, 994 (10th Cir. 2020) (elaborating that the prior

13

decision in *Cordova v. Aragon*, 569 F.3d 1183 (10th Cir. 2009), "clearly established" that "use of deadly force is clearly unreasonable when (1) the only threat is one posed by reckless driving and (2) the immediacy of the threat to the officer is a disputed fact that a reasonable jury could resolve against the officer," thus denying qualified immunity to the officer who allegedly fired upon fleeing truck driver as he passed the officer); *Vaughan v. Cox*, 343 F.3d 1323, 1333 (11th Cir. 2003) (denying qualified immunity to the officer, holding that where fleeing suspect did not pose immediate threat to officers or other drivers, "[a]pplying *Garner* in a common-sense way, a reasonable officer would have known that firing into the cabin of a pickup truck, traveling at approximately 80 miles per hour on Interstate 85 in the morning, would transform the risk of an accident on the highway into a virtual certainty"). Accordingly, binding precedent in our Circuit, along with persuasive authority from other Courts of Appeals, have "clearly established" the right at issue here, as defined above.

The force of these holdings is not blunted by the Supreme Court's decisions cited by the District Court in its analysis. Each cited case involves circumstances where either the fleeing driver in question had displayed threatening or aggressive behavior toward others prior to or during the car chase, or where the Court, based on the record, was willing to determine that the driver's conduct while fleeing was so egregious that it posed an immediate risk to the officers and the public. We will discuss the cases chronologically. First, in *Brosseau v. Haugen*, 543 U.S. 194 (2004) (per curiam), the Court noted that the incident in question took place before *Abraham* and other similar decisions had been issued, and thus the officer lacked whatever notice that those cases may have provided that her conduct may have violated the plaintiff's Fourth Amendment rights. 543 U.S. at 200 n.4. The Court further observed that the officer there had reason to believe that the plaintiff posed an immediate threat to the officer and other bystanders separately from his flight, as the officer was aware that the plaintiff had gotten into a physical altercation with "a former

14

crime partner" preceding her pursuit of him, and the plaintiff was wanted on a felony "no-bail" warrant. *Id.* at 195.

In *Scott v. Harris*, 550 U.S. 372 (2007), a police officer bumped a fleeing suspect off of the road after a high-speed chase where video footage recorded the car "swerve around more than a dozen other cars, cross the double-yellow line, and force cars traveling in both directions to their respective shoulders to avoid being hit." 550 U.S. at 379. Reversing the Court of Appeals, which adopted the plaintiff's version of the facts as is the ordinary course in reviewing a defendant's motion for summary judgment, the Supreme Court determined that the circumstances warranted an exceptional departure from such practice in light of a video depicting "a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury." *Id.* The Supreme Court further distinguished the force used by the officer in *Scott* from cases involving gunfire, noting that "[a] police car's bumping a fleeing car is, in fact, not much like a policeman's shooting a gun so as to hit a person," and remained agnostic as to whether the officer's actions constituted deadly force as defined by *Garner* and its progeny.[4] *Id.* at 383 (citation and quotation omitted).

The remaining two decisions cited by the District Court are distinguishable as well. The car chase in *Plumhoff v. Rickard*, 572 U.S. 765 (2014), was comparable to the circumstances in *Scott*, which the Supreme Court noted in its analysis. 572 U.S. at 775. In *Plumhoff*, a police officer stopped a driver whose car had only one operating headlight, and in the course

---

[4] In rejecting the defendant's argument that *Scott* had "overruled" *Abraham*, the panel in *Zion* determined that "*Scott* and *Abraham* are in fact in harmony: it may be reasonable for an officer to bump a car off the road to stop a reckless driver who is placing others in peril, while simultaneously unreasonable to shoot directly at a driver who is coming toward an officer when the officer has the opportunity to move out of the way." 556 F. App'x at 109.

15

of questioning, had reason to suspect the driver may have been drinking and had previously hit a pedestrian. *Id*. at 768, 769 n.1. Rather than step out of the vehicle when requested, the driver fled and led officers on a highway chase in which he evaded a "rolling road block" and passed over two dozen vehicles while "swerving through traffic" at speeds exceeding 100 miles per hour. *Id*. at 769. Upon finally being nearly cornered in a parking lot, the driver hit multiple police cruisers in his attempt to escape, and in making contact with the last cruiser, the driver's "tires started spinning, and his car was rocking back and forth, indicating that Rickard was using the accelerator even though his bumper was flush against a police cruiser." *Id*. at 770 (quotation and citation omitted). It was at this point that the officers in pursuit decided to fire upon the driver, which the Supreme Court determined was reasonable given the immediate danger posed by the driver's conduct to others during his chaotic flight. *Id*. at 777.

The underlying circumstances in *Mullenix v. Luna*, 577 U.S. 7 (2015) (per curiam), are also inapposite, particularly given the explicitly threatening nature of the driver's actions. In *Mullenix*, an individual with an outstanding arrest warrant fled in his vehicle when an officer attempted to apprehend him at a drive-in restaurant. 577 U.S. at 8. The driver subsequently "led the officers on an 18–minute chase at speeds between 85 and 110 miles per hour." *Id.* Moreover, and critically for the purposes of this discussion, "[t]wice during the chase, Leija called the Tulia Police dispatcher, claiming to have a gun and threatening to shoot at police officers if they did not abandon their pursuit. The dispatcher relayed Leija's threats, together with a report that Leija might be intoxicated, to all concerned officers." *Id.* Eventually, an officer stationed on an overpass shot at the driver's vehicle as it approached in an attempt to disable the vehicle, but the officer's bullets ended up striking and killing the driver. *Id*. at 9. In finding that the officer was entitled to qualified immunity, the Supreme Court distinguished the facts at issue from cases like *Lytle* in which the record was equivocal as to whether an officer was in harm's

16

way at the time of the shooting, finding that *Lytle* "does not clearly dictate the conclusion that Mullenix was unjustified in perceiving grave danger and responding accordingly, given that Leija was speeding towards a confrontation with officers he had threatened to kill." *Id.* at 17. There is no indication in the record before us that Jefferson was armed or had issued threats to any of the officers on the scene.

The District Court, in its opinion, relied, in part, on this Court's decision in *Bland v. City of Newark* to support the assertion that officers using deadly force during car chases do not violate the Fourth Amendment or are entitled to qualified immunity. 900 F.3d 77 (3d Cir. 2018); App. 9. However, the facts in *Bland* are distinguishable from the facts here, and our Court neatly outlined the series of facts that supported finding the officers' use of force reasonable:

> Bland's behavior threatened the safety of the officers, as well as the public at large. Before shots were fired at Lincoln Park, Bland drove at high speeds, disregarded traffic signals, drove the wrong way down a one-way street, collided with two occupied police vehicles, and failed to comply with orders to surrender. As the gunfire erupted, he repeatedly attempted to flee from police and state troopers, including by trying to drive with officers standing in close proximity to the [vehicle]. And he engaged in all of this behavior in a vehicle that had been reportedly taken at gunpoint a few hours earlier.

*Bland*, 900 F.3d at 84. Moreover, "at least one innocent civilian suffered harm by his flight when a state police car struck an occupied vehicle during the final leg of the pursuit." *Id.* at 86. The officers used deadly force only during times in which the vehicle was no longer moving. *Id.* at 81–82. The officers also contended "that Bland drove aggressively at [them] as he attempted to flee," and "all parties agreed that officers were standing less than 10 feet from the [vehicle] as Bland extricated it from the two vehicles." *Id.* at 81 n.3. Almost all the officers that shot Bland had witnessed these events, and the few who did not, at the very least, had reason to believe he was armed. *See id.* at 85–87.

Most notably, "[a]fter the crash, Bland threatened to kill the officers, and the record provides no evidence that he attempted to surrender at any time." *Id.* at 86. Two officers also testified that they fired their weapons because Bland not only threatened to kill them but also refused to show his hands and stop moving. *Id.* at 81. Another officer asserted that he fired after observing Bland making evasive movements inside the vehicle as the other officers fired their weapons. *Id.* In other words, there was a concern that Bland was armed, he then refused to show his hands, and he threatened to kill the police.

Whereas here, Officer Lias did not witness or know about any similar facts before using deadly force against Jefferson. Lias did not wait until Jefferson's vehicle was stationary to fire his weapon. Lias also had no reason to believe Jefferson was armed, and he was working only with the knowledge that Jefferson was *possibly* driving a stolen vehicle. App. 359–60. Furthermore, video footage makes clear that neither Officer Lias nor anyone else was in danger of being struck by Jefferson as he was passing him. App. 388. Therefore, the only real similarity between these two cases is that they both involved vehicles. But that is where the comparison ends. Where the officers in *Bland*—who shot Bland after he threatened to kill the officers while they were within ten feet of the vehicle that he had only just been dangerously operating—

18

acted reasonably, Officer Lias—who shot Jefferson while his vehicle was passing him knowing only that the vehicle might be stolen—did not.

Bland both threatened officers with deadly force and tried to use his vehicle as a deadly weapon. Jefferson did neither. The dissimilarities between *Bland* and *Jefferson* emphasize that it is reasonable to open fire on a suspect fleeing in a motor vehicle *only* in a narrow set of circumstances, a set under which the circumstances involving Officer Lias do not fall.

None of the Supreme Court cases cited by the District Court, then, disturb the "robust consensus" of cases decided by our sister circuits, let alone our own precedent, in clearly establishing that an otherwise non-threatening individual in engaged in vehicular flight is entitled to be free from being subjected to deadly force if it is unreasonable for an officer to believe his or others' lives are in immediate jeopardy from their actions. As such a right is clearly established, and because a jury may conclude that Officer Lias's decision to shoot Jefferson was not objectively reasonable, Officer Lias is not entitled to qualified immunity.[5]

## C. *Heck v. Humphrey* does not bar Jefferson's claims

Finally, Lias argues that Jefferson's claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). There, the Supreme Court held that a § 1983 action is barred if "a judgment in favor of the plaintiff would necessarily imply the invalidity of [a prior] conviction or sentence." *Heck*, 512 U.S. at 487. The conviction at issue here is second-degree eluding under N.J. Stat. Ann. § 2C:29-2(b), to which Jefferson pled guilty. A

---

[5] As noted in our discussion of the standard governing Fourth Amendment excessive force claims, a jury may conclude that Officer Lias's shooting was not "objectively reasonable." Thus, the first prong of the qualified immunity standard is also satisfied.

person may be convicted under New Jersey's eluding statute if he (1) knowingly flees or attempts to evade police while driving on a street or highway; (2) after having received a signal from the police officer indicating he should stop; and (3) creating a risk of death or injury to any person. Because "creating a risk of death or injury to any person" is an essential element of the conviction, Lias contends Jefferson's excessive force claim cannot proceed as Lias was justified in using deadly force to prevent the risk from continuing.

Lias's argument is unavailing for a number of reasons. For one, as we have explained above, precedent in our Circuit (and in accordance with opinions issued by our sister circuits) establishes that the unbounded use of deadly force is not justified against an individual in flight simply whenever they have precipitated risk to others. *See Lytle*, 560 F.3d at 415 ("Nearly any suspect fleeing in a motor vehicle poses some threat of harm to the public . . . the real inquiry is whether the fleeing suspect posed such a threat that the use of deadly force was justifiable."). If an individual has engaged in risky flight, but no longer is threatening to officers or the public, the use of deadly force against the individual may no longer be reasonable. The analysis as to whether the use of deadly force to halt a suspect's escape is "objectively reasonable" depends on the resolution of the kind of intensive, multi-factor analysis articulated by *Graham* and our subsequent Fourth Amendment excessive force precedent.

For another, we have declined to apply *Heck* to bar Fourth Amendment excessive force claims under § 1983 when we have found that the quantum of force used may have been disproportionate to the conduct implicated by the underlying conviction, even in cases involving resisting arrest and assaulting officers. *See, e.g.*, *Nelson v. Jashurek*, 109 F.3d 142, 145 (3d Cir. 1997) (holding *Heck* did not foreclose excessive force claim, noting that "the fact that Jashurek was justified in using 'substantial force' to arrest Nelson does not mean that he was justified in using an excessive amount of force and thus does

20

not mean that his actions in effectuating the arrest necessarily were objectively reasonable"); *Lora-Pena v. FBI*, 529 F.3d 503, 506 (3d Cir. 2008) (per curiam) (also declining to apply *Heck* to bar an excessive force claim, noting "Lora–Pena's convictions for resisting arrest and assaulting officers would not be inconsistent with a holding that the officers, during a lawful arrest, used excessive (or unlawful) force in response to his own unlawful actions."). Consequently, Lias's reliance upon *Heck* to defeat Jefferson's excessive force claim is misguided.

## D. Jefferson's *Monell* claim will be reinstated

Finally, the District Court determined that Jefferson's *Monell* failure to train claim against the City of Elizabeth failed as a matter of law because he could not demonstrate any underlying constitutional violation. *See Mulholland v. Gov't Cty. of Berks*, 706 F.3d 227, 238 n.15 (3d Cir. 2013) (noting "[i]t is well-settled that, if there is no violation in the first place, there can be no derivative municipal claim" based on *Monell*). Given our contrary conclusion that Jefferson may be able to make out a Fourth Amendment excessive force claim against Lias, however, we will reverse the District Court's ruling on Jefferson's *Monell* claim and request that the District Court analyze it on the merits in the first instance.

## III. CONCLUSION

For the foregoing reasons, we will vacate the District Court's grant of Lias's motion for summary judgment and remand this case for further consideration consistent with this opinion.

MCKEE, *Circuit Judge*, with whom Judges RESTREPO and FUENTES join, concurring.

I join the Court's opinion in its entirety and agree that we must vacate the District Court's grant of summary judgment and remand for the reasons my colleagues explain. I write separately because I think it is important to explain that the deference to law enforcement that consistently results in qualified immunity in excessive force cases is inconsistent with the vast amount of research in such cases as well as the evolving national consensus of law enforcement organizations. In *Kisela v. Hughes*, the Supreme Court stated:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. [And] the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation.[1]

In response, Justice Sotomayor observed:

> [T]his Court routinely displays an unflinching willingness "to summarily reverse courts for wrongly denying officers the protection of qualified immunity" but "rarely intervenes where courts wrongly afford officers the benefit of qualified immunity in these same cases." . . . [The Majority] tells officers that they can shoot first and think later, and it tells the public that palpably unreasonable conduct will go unpunished.[2]

Research as well as policies mandated by police agencies themselves support Justice Sotomayor's observation. In fact, given numerous studies and policies of leading law

---

[1] -- U.S. --, 138 S. Ct. 1148, 1152, 200 L.Ed.2d 449 (2018) (per curiam) (citation omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

[2] *Id*. at 1162 (Sotomayor, J., dissenting) (citations omitted).

enforcement organizations in the United States, including the International Association of Chiefs of Police (IACP), there is a growing consensus that it is simply unreasonable for officers to shoot at fleeing suspects. It stands to reason that police agencies like the IACP are much more aware than judges of the need to respect an individual officer's "heat of the moment" decision. Accordingly, as I will explain, given these studies and policies, it should by now be crystal clear that, except for a narrow set of circumstances that police agencies have already carefully defined, it is *never* reasonable for a police officer to open fire on a suspect fleeing in a motor vehicle. Far from being reasonable, it will almost always be reckless. And police recognize as much.

## I.

As my colleagues explain, we apply a multi-factor test to determine whether an officer's use of force is reasonable.[3] We must determine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."[4] Of course, an officer will never face circumstances identical to those she or other officers have faced before. Accordingly, reasonableness is a fluid concept that must be assessed in context with all of the circumstances in a given case.[5]

However, in cases involving officers shooting at suspects fleeing in motor vehicles, one fact will be constant: opening fire creates a risk that police agencies themselves generally agree is almost always unreasonable; and it is a risk that is both unnecessary and avoidable. The chance of successfully apprehending the suspect in this manner is low and the risk to bystanders, including other police officers, is quite high. The low probability of hitting a moving target will therefore never justify the attendant risk, except in a narrow set

---

[3] Maj. Op. at 6–7.
[4] *Graham v. Connor*, 490 U.S. 386, 397 (1989).
[5] *Abraham v. Raso*, 183 F.3d 279, 291 (3d Cir. 1999) ("[R]easonableness should be sensitive to all of the factors bearing on the officer's use of force.").

2

of circumstances, which police agencies have already carefully defined.

## A.

Firearms are, of course, inherently lethal. Indeed, lethality is their very purpose. For reasons that should be readily apparent, the risk of lethality is especially high when an officer shoots at a fleeing suspect. Because of this high risk, a consensus has emerged among law enforcement agencies and police experts that is in tension with qualified immunity jurisprudence. This consensus is that, except for a very limited and identified set of circumstances, it is never reasonable for a police officer to shoot at a fleeing suspect. Courts need look no further than the *National Consensus Policy and Discussion Paper on Use of Force* to appreciate this. That is a model policy published by eleven "of the most significant law enforcement leadership and labor organizations in the United States," including the IACP and the Fraternal Order of Police (see footnote for a complete list of all eleven organizations).[6] This model policy bars police from firing at a suspect fleeing in a moving vehicle in almost all situations.[7] The narrow

---

[6] INT'L ASS'N OF CHIEFS OF POLICE ET AL., NATIONAL CONSENSUS POLICY AND DISCUSSION PAPER ON USE OF FORCE 1 (July 2020), *available at* https://www.theiacp.org/sites/default/files/2020-07/National_Consensus_Policy_On_Use_Of_Force%200710 2020%20v3.pdf. The eleven organizations include the Association of State Criminal Investigative Agencies, Commission on Accreditation for Law Enforcement Agencies, Fraternal Order of Police, Federal Law Enforcement Officers Association, International Association of Chiefs of Police, Hispanic American Police Command Officers Association, International Association of Directors of Law Enforcement, National Association of Police Organizations, National Association of Women Law Enforcement Executives, National Organization of Black Law Enforcement Executives, and National Tactical Officers Association. *Id.* at 16.

[7] *Id.* at 13; *see also* John P. Gross, *Unguided Missiles: Why the Supreme Court Should Prohibit Police Officers from Shooting at Moving Vehicles*, 164 U. PA. L. REV. ONLINE

circumstances in which these organizations permit officers to even "*consider*" shooting at a moving vehicle are limited to "when 'a person in the vehicle is immediately threatening the officer or another person with deadly force by means other than the vehicle,' or when the vehicle is intentionally being used as a deadly weapon and 'all other reasonable means of defense have been exhausted.'"[8]

In developing this type of policy over the years, law enforcement agencies and police experts considered numerous factors.[9] Although many of these underly the jurisprudence in this area, most are not considered by court decisions dealing with qualified immunity. They include the fact that officers need to react quickly in emotional situations; police firearms usually cannot penetrate a vehicle's body, tires, or safety glass; ricocheting bullets can injure or kill bystanders; and vehicles can "continue under [their] own power or momentum for some distance," threatening those in the area even in the unlikely event that the officer actually hits the driver.[10]

Ironically, and very significantly, the Elizabeth Police Department, Officer Lias's own department, provides a link on its website to the guidelines of the New Jersey Attorney General.[11] That website includes a prohibition similar to the aforementioned model policy, forbidding officers from firing at a driver or vehicle's occupant unless there is "an imminent

---

135, 139 (2016) (citing INT'L ASS'N OF CHIEFS OF POLICE, MODEL POLICY: USE OF FORCE 1 (Feb. 2006) [hereinafter 2006 Model Policy], https://www.documentcloud.org/documents/2303826-useofforcepolicy.html).

[8] INT'L ASSOC. OF CHIEFS OF POLICE ET AL., *supra* note 6, at 14 (emphasis added).

[9] *See, e.g.*, 2006 Model Policy, *supra* note 7, at 1.

[10] John P. Gross, *supra* note 7, at 139–40 (citing 2006 Model Policy, *supra* note 7, at 1).

[11] ELIZABETH POLICE DEP'T, ABOUT THE ELIZABETH POLICE DEPARTMENT, https://www.elizabethnj.org/160/About (click AG Guidelines).

danger of death or serious bodily harm" and "*no other means are available*."[12]

It is realistic, practical, and reasonable to expect Officer Lias and police officers generally to be aware of the policy pronouncements of their own police departments. This is especially true given that qualified immunity jurisprudence currently rests on the faulty assumption that police are not only sufficiently informed about the maybe hundreds or even thousands of applicable court decisions, but also able to "assess, before acting, whether [these] prior court decisions clearly establish that their conduct would violate the Constitution."[13] This is little more than myth. Even a cursory examination would lead one to conclude that such an expectation is unrealistic, impractical, and unreasonable.[14]

---

[12] ATTORNEY GENERAL'S USE OF FORCE POLICY 5–6 (2000), https://www.nj.gov/oag/dcj/agguide/useofforce2001.pdf (emphasis added).

[13] Joanna C. Schwartz, *Qualified Immunity's Boldest Lie*, 88 U. CH. L. R. 605, 619 (2021).

[14] Although beyond the scope of this opinion, this is an additional problem with qualified immunity jurisprudence:

> [E]ven if law enforcement agencies made more of an effort to educate their officers about court decisions analyzing the constitutional limits of force, the expectations of notice and reliance baked into qualified immunity doctrine would be obviously unrealistic. There could never be sufficient time to train officers about all the court cases that might clearly establish the law. And even if officers were trained about the facts and holdings of some portion of these cases, there is no reason to believe that officers would analogize or distinguish situations rapidly unfolding before them to the court decisions they once studied.
>
> There is a growing consensus among courts, scholars, and advocates across the ideological spectrum that qualified immunity doctrine is

Yet, if we are to assume that police can stay abreast of the minutia of the law, then they certainly should be expected to know the policies of their own department as well as generally accepted police best practices.

Not surprisingly, given the inaccuracy and danger endemic to shooting at moving vehicles, discussed in more detail below, some police departments have outright banned the practice. The New York City Police Department was likely one of the first to do so. It disallowed firing at a moving vehicle nearly half a century ago in 1972.[15] Since then, many other departments have enacted similar restrictions.[16] The Philadelphia Police Department policy, for example, prohibits the practice and explains why the prohibition is consistent with sound (i.e., "reasonable") police practices. Thus, the policy states that firing at a moving vehicle is prohibited for the following reasons:

- To avoid unnecessarily endangering innocent persons, both when inside the vehicle and in the vicinity.
- Bullets fired at a moving vehicle are extremely unlikely to disable or stop the vehicle.
- Disabling the driver of a moving vehicle creates unpredictable circumstances that may cause the vehicle to crash and injure other officers or innocent bystanders.

legally unsound, unnecessary to shield government officials from the costs and burdens of litigation, and destructive to police accountability efforts. . . .

*Id.* at 605. See Joanna C. Schwartz, *Qualified Immunity's Boldest Lie*, 88 U. CH. L. R. 605 (2021) for more on the unreasonableness of this assumption.

[15] Sharon R. Fairley, *The Police Encounter with a Fleeing Motorist: Dilemma or Debacle*, 52 U.C. DAVIS L. REV. ONLINE 155, 193 (citing Jon Swaine, Jamiles Lartey & Oliver Laughland, *Moving Targets*, GUARDIAN (Sept. 1, 2015, 9:42 AM), https://www.theguardian.com/us-news/2015/sep/01/moving-targets-police-shootings-vehicles-the-counted).

[16] *Id.*

- Moving to cover in order to gain and maintain a superior tactical advantage maximizes officer and public safety while minimizing the need for deadly or potentially deadly force.[17]

Similarly, because of the high risk associated with shooting at a moving vehicle, the Chicago Police Department requires its officers to "move out of the vehicle's path" rather than shoot, even if the vehicle is headed right towards the officer.[18] The model policy on the use of force for police, mentioned above, similarly advises against discharging firearms at moving vehicles.[19]

These policies and pronouncements illustrate how police departments across this country have essentially come to a consensus that shooting at fleeing suspects in vehicles is never reasonable and will always be very reckless, except for the rarest of circumstances specifically noted in those policies. The reasonableness standard by which we judge an officer's use of force should—at the very least—reflect and consider the stringency of these policies—promulgated by experts in policing and not by courts.[20]

**B.**

---

[17] PHILA. POLICE DEP'T, USE OF FORCE–INVOLVING THE DISCHARGE OF FIREARMS 7 (Sept. 18, 2015), https://www.phillypolice.com/assets/directives/D10.1.pdf.

[18] Fairley, *supra* note 15, at 194 (quoting CHI. POLICE DEP'T, GENERAL ORDER 03-02-03; DEADLY FORCE 13 (Oct. 1, 2002), https://www.chicagocopa.org/wp-content/uploads/2017/10/Use-of-Force-Policy-Report-Final.pdf).

[19] 2006 Model Policy, *supra* note 7, at 1; *see also* DEP'T OF JUST., FEDERAL REPORTS ON POLICE KILLINGS: FERGUSON, CLEVELAND, BALTIMORE, AND CHICAGO 295 (2017).

[20] *See* BERNARD D. ROSTKER ET AL., RAND CORP., EVALUATION OF THE NEW YORK CITY POLICE DEPARTMENT FIREARM TRAINING AND FIREARM-DISCHARGE REVIEW PROCESS xiv–xv (2008) ("[D]epartment guidelines for the use of deadly physical force are more stringent than the standards set by the *Graham* case . . . .").

7

Examining the "hit rates" of police officers supports the reasoning behind these policies and may well explain why police organizations have adopted them. Inquiries into reasonableness of force should consider the low rates of officers hitting their targets. Yet, even though police policies appear to consider this, courts do not even mention it.

Despite most police officers receiving weapons training,[21] research shows that they are much more likely to miss their targets than to hit them.[22] Indeed, studies considering overall hit rates have consistently shown that police officers rarely achieve a 50% shooting-accuracy rate.[23] In a study examining the accuracy of 149 officer-involved shootings in the Dallas Police Department between 2003 and 2017, only 35% of rounds fired hit their targets.[24] Two conclusions follow from these and similar studies. First, the fleeing suspect will often not be apprehended, and others (including other officers) are placed in danger.[25] Second, if the

---

[21] *See, e.g.*, ROSTKER ET AL., *supra* note 20, at 17–23 (providing an overview of the type of training the New York Police Department provides).

[22] *See* Christopher M. Donner & Nicole Popovich, *Hitting (or Missing) the Mark: An Examination of Police Shooting Accuracy in Officer-Involved Shooting Incidents*, 42 POLICING: AN INT'L J. 474, 475 (2019); ROSTKER ET AL., *supra* note 20, at 14; Michael D. White, *Hitting the Target (or Not): Comparing Characteristics of Fatal, Injurious, and Noninjurious Police Shootings*, 9 POLICE Q. 303, 304 (2006).

[23] Donner & Popovich, *supra* note 22, at 475–76 ("A study conducted on shooting accuracy in 13 large American police departments during the 1970s and 1980s found that between 22 and 42 percent of rounds fired by officers hit their intended target. Several reports have also focused on the largest US police department, New York City. OIS data revealed hit rates of 26, 31 and 23 percent in 1987, 1988 and 1990, respectively. Data collected between 1999 and 2000 revealed a 15 percent hit rate among officers. Between 1998 and 2006, the average hit rate was 18 percent." (citations omitted)).

[24] *Id.* at 481.

[25] DEP'T OF JUST., *supra* note 19, at 294–95 (detailing Department of Justice reports on police killings).

8

suspect is fleeing in a car, and in the unlikely event that the officer does succeed in hitting the suspect, the officer creates an even deadlier risk to those nearby. The vehicle will be transformed into an out-of-control, 4,000-pound[26] "unguided missile" careening through the street.[27] It should therefore not be surprising that a Department of Justice report concludes that shooting at moving vehicles "creates greater risks than it eliminates."[28] It is also no surprise that police agencies limit this use of deadly force to a very narrow set of carefully delineated circumstances discussed above, and then, only if "all other reasonable means of defense have been exhausted."[29]

These studies reflecting a low level of accuracy are not outliers. Hit rates are consistently low among police departments.[30] As a more recent example, in 2019, officers in the Los Angeles Police Department hit their targets an

---

[26] The average new vehicle weight for model year 2019 was 4,156 pounds. ENV'T PROT. AGENCY, THE 2020 EPA AUTOMOTIVE TRENDS REPORT 18 (2021), *available at* https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P1010U68.pdf.

[27] Fairley, *supra* note 15, at 194 (quoting Wesley Lowery et al., *Police Have Killed Nearly 200 People Who Were in Moving Vehicles Since 2015, Including 15-year-old Jordan Edwards*, WASH. POST (May 3, 2017), https://www.washingtonpost.com/news/post-nation/wp/2017/05/03/police-have-killed-nearly-200-people-who-were-in-moving-vehicles-since-2015-including-15-year-old-jordan-edwards/). *See also* INT'L ASSOC. OF CHIEFS OF POLICE ET AL., *supra* note 6, at 14 ("[S]hould the driver be wounded or killed by shots fired, the vehicle might proceed out of control and could become a serious threat to officers and others in the area.").

[28] DEP'T OF JUST., *supra* note 19, at 294–95 (detailing Department of Justice reports on police killings).

[29] Fairley, *supra* note 15, at 196.

[30] *See* White, *supra* note 22, at 307 ("Research has consistently shown that although there is substantial variation across police departments, hit rates typically dip well below 50%.").

underwhelming 28% of the time.[31]  Between 1998 and 2006, the hit rate for the New York City Police Department averaged an even less impressive 18%.[32]  To further compound this problem, police are even more likely to miss when their targets are moving.[33]  This should not surprise anyone as common sense would suggest as much.  Yet, in most cases involving qualified immunity and unnecessary force, the suspect will be moving away from the officer and doing so at considerable speed.  One does not need to master Newton's laws of motion or probability theory to appreciate that all of these factors combine to greatly reduce the chances of apprehending a fleeing suspect by shooting at them.  While the chances of a successful apprehension are extremely small, the concomitant risk to everyone in the vicinity, including other officers, is exceedingly high.   Yet, the jurisprudence of qualified immunity in such cases consistently fails to address this reality.  A reality which police are well aware of, have grappled with, and have taken steps to address.

## C.

---

[31] Michel R. Moore, *Los Angeles Police Department Use of Force Year-End Review*, L.A. POLICE DEP'T 164 (2019), http://lapd-assets.lapdonline.org/assets/pdf/2019_uof_review.pdf.  This statistic contemplates officer-involved shooting incidents, which includes situations in which a suspect first "fired at an officer or [third] party," "the suspect had a firearm in hand or in a position to fire (but did not fire)," a suspect's "firearm was present but not drawn," the suspect had no firearm, or "the suspect [was] armed with [a] weapon other than [a] firearm." *Id.* at 147.

[32] Donner & Popovich*, supra* note 22, at 476.

[33] *See* BRIAN R. JOHNSON, CRUCIAL ELEMENTS IN FIREARMS TRAINING, 39 (2007).  Other factors that impact police shooting accuracy include whether the shooting occurs at nighttime and whether the officer is shooting at a non-white suspect.  Donner & Popovich, *supra* note 22, at 481.  There is an entire field of shooter bias that finds police are more likely to shoot non-white suspects, whether armed or disarmed, than white suspects.  *See* R. Richard Banks et al., *Discrimination and Implicit Bias in a Racially Unequal Society*, 94 CAL. L. REV. 1169, 1180 (2006).

It thus follows that the risk of danger and average hit rates associated with shooting at fleeing suspects should be part of the calculus when determining the reasonableness of an officer's use of force. It is simply no answer to this concern to merely defer to the officer on the scene because of the need for "heat of the moment" decisions. Surely, the police agencies that have adopted the policies discussed above are much more aware than judges of the need to respect an individual officer's "heat of the moment" decision.[34] The circumstances that justify the risk are encapsulated in these agencies' applicable policies.[35] Therefore, when an officer discharges a firearm at a suspect fleeing in a motor vehicle, as Officer Lias did here, the law needs to recognize that except in the rarest of circumstances (which have been delineated by police experts) it will be an unreasonable use of force to shoot at the fleeing suspect.[36]

Before concluding, it is worth noting that my colleagues' explanation of the dissimilarities between the circumstances here and those in *Bland v. City of Newark* further illustrates why so many researchers and law enforcement organizations now conclude that, except in very narrow circumstances not present here, it will always be

---

[34] As mentioned above, many police agencies have adopted policies restricting officers use of force against fleeing suspects. *See* Fairley, *supra* note 15, at 193. Because of the extensive research in this area and the number of carefully thought-out policies of police and law enforcement agencies, the absence of such a policy in a given jurisdiction may well have implications for municipal liability under *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658 (1978).

[35] *See, e.g.*, INT'L ASSOC. OF CHIEFS OF POLICE ET AL., *supra* note 6, at 14 ("Officers should consider this use of deadly force only when 'a person in the vehicle is immediately threatening the officer or another person with deadly force by means other than the vehicle,' or when the vehicle is intentionally being used as a deadly weapon and 'all other reasonable means of defense have been exhausted (or are not present or practical).'").

[36] None of the circumstances which police agencies have determined justify use of such force are present here.

unreasonable for police to shoot at a fleeing suspect.[37]   In *Bland*, in discussing the first encounter with the fleeing suspect, we noted: "During this encounter, the six state troopers fired a total of 28 shots, none of which hit Bland."[38]

## II. Conclusion

It is both understandable and reasonable that courts should give great deference to the need for split-second decisions in a qualified immunity analysis arising from allegations of excessive force.  It is neither understandable nor reasonable for the law to continue to turn a blind eye to the fact that police agencies themselves have condemned the use of deadly force in certain situations.  Nor is it understandable or reasonable for the law to continue to reward a police officer who ignores policy (or the risk inherent in discharging a firearm) with the cloak of qualified immunity.  The law's failure to consider police agencies' own disavowal of deadly force in certain situations, while purporting to defer to the realities and needs of law enforcement, has birthed a cruel and unjust irony.

As Justice Sotomayor so aptly wrote, the approach to qualified immunity has become so one-sided that it has "transform[ed] the doctrine into an absolute shield for law enforcement officers, gutting the deterrent effect of the Fourth Amendment."[39]   The paradox that has evolved is that the perceived need to defer to the split-second decisions of trained professionals that is endemic to the jurisprudence in this area has failed to recognize the collective judgments of those very professionals and their administrative and governing agencies.

I can only hope that this divergence will soon come to an end, so that the considered judgment of police agencies and the law of deadly force can coalesce into a more realistic legal framework: one that would allow those who deserve redress to get it without having to penetrate the practically impenetrable wall of qualified immunity.

---

[37] *See* Maj. Op. at 17–19 (discussing *Bland v. City of Newark*, 900 F.3d 77 (3d Cir. 2018)).

[38] 900 F.3d at 81.

[39] *Kisela*, 138 S.Ct. at 1162 (Sotomayor, J., dissenting).