**[J-76-2021] [MO: Dougherty, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 17 EAP 2021 |
| | : | |
| Appellant | : | Appeal from the Judgment of |
| | : | Superior Court entered on 9/4/2020 |
| | : | at No. 148 EDA 2020 Quashing the |
| v. | : | appeal from the order entered on |
| | : | 12/30/2019 in the Court of Common |
| | : | Pleas, Philadelphia County, Criminal |
| RYAN POWNALL, | : | Division at No. CP-51-CR-0007307- |
| | : | 2018. |
| Appellee | : | |
| | : | ARGUED:  December 7, 2021 |

**DISSENTING OPINION**

**JUSTICE WECHT**                                                          **DECIDED:  July 20, 2022**

The Commonwealth charged ex-Philadelphia Police Officer Ryan Pownall with criminal homicide, possession of an instrument of a crime, and recklessly endangering another person in connection with the fatal shooting of David Jones.  Anticipating that Pownall would invoke the peace-officer justification defense at trial, the Commonwealth filed a pretrial motion *in limine* seeking to prevent the trial court from issuing to the jury the suggested standard jury instruction for that defense.  That suggested instruction mirrors the following statutory language:

> A peace officer . . . need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest.  He is justified in the use of any force which he believes to be necessary to effect the arrest and of any force which he believes to be necessary to defend himself or another from bodily harm while making the arrest.  However, he is justified in using deadly force only when he believes that such force is necessary to prevent death or serious bodily injury to himself or such other person, or when he believes both that:
>
> (i)     such force is necessary to prevent the arrest from being defeated by resistance or escape; and

(ii)    the person to be arrested has committed or attempted a forcible felony or is attempting to escape and possesses a deadly weapon, or otherwise indicates that he will endanger human life or inflict serious bodily injury unless arrested without delay.

18 Pa.C.S. § 508(a)(1).

The Commonwealth argued that Section 508(a)(1)'s justification defense "is unconstitutional under the Fourth Amendment to the United States Constitution, as interpreted by the United States Supreme Court" in *Tennessee v. Garner*, 471 U.S. 1 (1985).  Commonwealth's Mot. *in Limine*, 11/25/2019, at 3.  The Commonwealth's alternative instruction proposed to condition a police officer's use of lethal force upon a showing that the force was reasonably necessary to prevent an imminent threat of death or serious bodily harm to either the officer or another person.  The trial court declined the Commonwealth's invitation, ruling that "[t]he Commonwealth's *Motion in Limine*, on its own, is insufficient to establish the unconstitutionality of Section 508, and its suggested remedies are inappropriate."  Tr. Ct. Op., 12/30/2019, at 3.

After the trial court denied the motion *in limine*, and before the commencement of Pownall's trial, the Commonwealth appealed, claiming that it was entitled to do so pursuant to, *inter alia*, the collateral order doctrine, as embodied in Pa.R.A.P. 313.  Under Rule 313(b), an order is collateral and may be appealed before final judgment if it (1) is "separable from and collateral to the main cause of action," (2) involves a right that "is too important to be denied review," and (3) presents a claim that "will be irreparably lost" if appellate "review is postponed until final judgment."

The Superior Court quashed the appeal by a *per curiam* judgment order, concluding that the propriety of Pownall's justification defense failed the separability requirement of Rule 313(b).  The Commonwealth now asks this Court to reverse the Superior Court, again asserting that it has met all three requirements of the collateral order doctrine and is entitled to an immediate appeal.

Like the court below, today's Majority concludes that the contested order is not a collateral one, deciding that the issue raised therein is not separable from the main cause of action. The Majority arrives at that determination by noting that separability exists where the issue to be raised in the interlocutory appeal is entirely distinct from the central issue underlying the case, which, in a criminal prosecution, "is whether the defendant 'committed the crimes charged.'" Maj. Op. at 28 (quoting *Commonwealth v. Shearer*, 882 A.2d 462, 469 (Pa. 2005)). The crux of the Majority's separability analysis is its belief that the Commonwealth's constitutional challenge and Pownall's guilt or innocence are hopelessly entangled. If the challenge is successful, the Majority asserts, it "would essentially criminalize conduct the General Assembly has deemed non-criminal." *Id.* Taken to its logical end, the Majority's reasoning removes from the collateral order doctrine's reach any Commonwealth appeal wherein it questions either the meaning of or the constitutional validity of a statutory defense. This leads to the core infirmity in the Majority's rationale.

As a result of the Majority's overly narrow assessment, the Commonwealth will *never* be able to secure appellate review of a trial court's denial of a challenge implicating a statutory defense. If a defendant is acquitted, double jeopardy principles bar the Commonwealth from seeking review of the challenged defense.[1] On the other hand, if a defendant is convicted despite the denial of a Commonwealth objection to a statutory defense, the Commonwealth would not be an aggrieved party entitled to challenge the denial on appeal.[2] As far as I can tell, the only circumstance in which an appellate court

---

[1]    *See Commonwealth v. Gibbons*, 784 A.2d 776, 778 (Pa. 2001) (explaining that double jeopardy bars a Commonwealth appeal from a judgment of acquittal).

[2]    Under Pa.R.A.P. 501, "[o]nly an aggrieved party can appeal from an order entered by a lower court." *Commonwealth v. Polo*, 759 A.2d 372, 373 n. 1 (Pa. 2000).

ever could assess a Commonwealth challenge to the meaning or the constitutional validity of a statutory defense would occur if a trial court certifies the order denying relief for immediate pretrial appeal.[3]  Surely our appellate rules do not aim to turn trial judges into the sole and final arbiters of vital matters of statewide import, such as the merits question presented here.  Yet that is the precise result of today's decision.

What's more, our caselaw on the collateral order doctrine does not mandate the Majority's conclusion.  The Court today makes light of the settled principle that an issue is separable from the main cause of action when it is analytically distinct from the central question at trial.  We are presented here with a purely legal question that may affect, but cannot be affected by, the answer to the ultimate issue in this case.  For that reason, the Supreme Court of the United States has held that constitutional issues nearly identical to the merits question in today's case are reviewable before final judgment under the collateral order doctrine.[4]  I would join the Supreme Court's approach in that regard, and I conclude that the collateral order doctrine entitles the Commonwealth to an interlocutory appeal.  Because the Majority holds otherwise, I respectfully dissent.  I would instead proceed to address the merits of the Commonwealth's claim that Section 508(a)(1) runs afoul of the Fourth Amendment.

A full account of my reasoning follows.

### I. The Commonwealth is entitled to an appeal under Pa.R.A.P. 313.

"Generally speaking, an appellate court's jurisdiction extends only to review of final orders," *Shearer v. Hafer*, 177 A.3d 850, 855 (Pa. 2018).  Final orders are those which

---

[3]    *See* Pa.R.A.P. 312 ("An appeal from an interlocutory order may be taken by permission pursuant to Chapter 13 (interlocutory appeals by permission)."); *see also* Pa.R.A.P. 1311(a) (providing that "[a]n appeal may be taken by permission from an interlocutory order" that meets one of three conditions).

[4]    See the discussion of *Plumhoff v. Rickard*, 572 U.S. 765 (2014), *infra*.

"(1) dispose of all claims and all parties, (2) are explicitly defined as final orders by statute, or (3) are certified as final orders by the trial court or other reviewing body."  *Id.* at 856 (citing Pa.R.A.P. 341).  This "final judgment rule" is a principle that aims "to combine in one review all stages of the proceeding that effectively may be reviewed and corrected if and when final judgment results."  *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949).  Delaying appellate adjudication until final judgment "maintains distinctions between trial and appellate review, respects the traditional role of the trial judge, and promotes formality, completeness, and efficiency."  *Shearer*, 177 A.3d at 855.  Thus, the rule bars review where an interlocutory appeal would make "unwise use of appellate courts' time, by forcing them to decide in the context of a less developed record, an issue very similar to one they may well decide anyway later, on a record that will permit a better decision."  *Johnson v. Jones*, 515 U.S. 304, 317 (1995).

As an exception to the final judgment rule, the purpose of the collateral order doctrine is to allow an interlocutory appeal in those cases where rigid application of the general rule would prove to be an exercise in empty formalism.  *See Bell v. Beneficial Consumer Discount Co.*, 348 A.2d 734, 736 (Pa. 1975) (defining collateral orders as orders that "possess sufficiently practical aspects of finality to make them appealable").  The exception sets forth a three-pronged test to decide whether an order, while not bringing a technical end of litigation, so closely partakes of the nature of a final order that immediate appellate review is warranted.

One way that the collateral order doctrine does this is by requiring that the order in question jeopardize rights that "will be irreparably lost" absent immediate review.  Pa.R.A.P. 313(b); *see Cohen*, 337 U.S. at 546.  In other words, "the bell has been rung, and cannot be unrung by a later appeal."  *Commonwealth v. Harris*, 32 A.3d 243, 249 (Pa. 2011).  This irreparable-loss requirement ensures that interlocutory review occurs

only in cases of necessity, thereby reflecting a central tenet of the final order rule: Trial proceedings should not be delayed unnecessarily, and appellate courts should not review matters that, "had the trial simply proceeded, would have turned out to be unnecessary." *Johnson*, 515 U.S. at 309.

The irreparable-loss prong goes a long way in promoting the goals of the final judgment rule, but it does not do all the work. The separability and importance prongs also ensure harmony with the spirit of the final judgment rule. "The requirement that the matter be separate from the merits of the action itself means that review *now* is less likely to force the appellate court to consider approximately the same (or a very similar) matter more than once." *Id*. at 311 (emphasis in original). Separability also confirms that there is no need for additional information of "record that will permit a better decision." *Id*. at 317. The final requirement, the importance prong, tasks an appellate court with assessing whether "the interests implicated in any given case" outweigh "the costs of piecemeal litigation." *Geniviva v. Frisk*, 725 A.2d 1209, 1213 (Pa. 1999). A trial court's order is weighty enough to warrant interlocutory review where it involves "rights deeply rooted in public policy going beyond the particular litigation at hand." *Id*. at 1214.

This Court has made clear that all three prongs of the collateral order doctrine must be satisfied; otherwise, the final order rule mandates quashal. *Shearer*, 177 A.3d at 858. Here, the Majority finds that the contested order does not raise an issue capable of separation from the main cause of action, and on that basis quashes the Commonwealth's appeal. My colleagues note that, because this is a criminal case, the main cause of action is "Pownall's potential guilt or innocence of the crimes charged." Maj. Op. at 28. They observe that the Commonwealth's challenge, if successful, would limit the defenses available to Pownall and broaden his exposure to criminal liability. From that observation, the Majority concludes that "it is impossible to separate" the

Commonwealth's constitutional claim from the question of Pownall's culpability. *Id.* The Majority anchors that assessment in its sweeping and generalized pronouncement that separability exists only if the challenged order is "entirely distinct from Pownall's potential guilt or innocence of the crimes charged." *Id.* at 30.

The Majority's analysis turns upon an oversimplification of our caselaw defining separability. That prong is not nearly as unforgiving as the Majority's condensed account would lead one to believe. Our separability principles aim to prevent an appellate court from needlessly addressing identical issues more than once in a given case. In other words, the separability requirement ensures that an appellate court need not decide an interstitial question unnecessarily and futilely, nor an issue that requires further development in the trial court. *See Johnson*, 515 U.S. at 309, 317. Thus, the crux of the separability inquiry is whether the challenged order raises an issue that is "conceptually and factually distinct from the merits." *Pridgen v. Parker Hannifin Corp.*, 905 A.2d 422, 433 (Pa. 2006). The Majority briefly mentions conceptual distinctness but fails to apply that concept in a manner consistent with our precedent on the subject.

Like the Supreme Court of the United States,[5] which at times has taken a narrower view of the collateral order doctrine than has this Court,[6] we have recognized that "a claim is sufficiently separate from the underlying issues for purposes of collateral order review if it 'is conceptually distinct from the merits of plaintiff's claim,' that is, where, even if

[5] "Because Pennsylvania adopted the collateral order doctrine from the United States Supreme Court, we continue to look to that Court's decisions for guidance in defining the contours of Rule 313." *Brooks v. Ewing Cole, Inc.*, 259 A.3d 359, 370 (Pa. 2021).

[6] *See Shearer*, 177 A.3d at 857 (recognizing that our collateral order doctrine has wider application than its federal counterpart); *Brooks*, 259 A.3d at 370 (explaining that "this Court has not remained in lockstep with the United States Supreme Court's recently imposed limitations on the collateral order doctrine in attorney-client privilege cases grounded in the High Court's determination that privilege claims are not irreparably lost as they are reviewable after a final judgment").

'practically intertwined with the merits, it nonetheless raises a question that is significantly different from the questions underlying plaintiff's claim on the merits.'" *Id.* (quoting *Johnson*, 515 U.S. at 314). A claim is "significantly different" from the underlying issue "if it can be resolved without an analysis of the merits of the underlying dispute." *Commonwealth v. Williams*, 86 A.3d 771, 781 (Pa. 2014); *see id.* (taking a "practical approach" to questions of separability).

As a general rule, no assessment of the merits is needed if the challenged order raises "a purely legal question." *Brooks*, 259 A.3d at 372; *see Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985) (holding that a claim of qualified immunity is separable from the merits of the underlying claim because "[a]n appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim. All it need determine is a question of law"). That said, the existence of some factual overlap is not disqualifying. *See Mitchell*, 472 U.S. at 528 (holding that a party was entitled to immediately appeal the trial court's unfavorable resolution of legal issues, notwithstanding that "the resolution of these legal issues will entail consideration of the factual allegations that make up the plaintiff's claim for relief"). The critical question is whether "an appellate court's frame of reference will be centered on the" legal question. *Pridgen*, 905 A.2d at 433.

This case is focused squarely upon a constitutional analysis untethered to any factual development or predicates. Each aspect of that analysis is a pure question of law that can be resolved without resort to or consideration of the question of guilt or innocence. The Commonwealth's merits argument has three core components. First, the Commonwealth claims that "Section 508(a)(1) permits the use of deadly force in situations that violate a person's constitutional rights by allowing law enforcement officers

to employ it absent (1) a need to prevent death or serious bodily injury and (2) consideration of whether such use of force is objectively reasonable." Commonwealth's Br. at 23. Addressing this first aspect of the Commonwealth's argument requires an appellate court to interpret Section 508 (whether the statute would provide a justification defense in the situations identified by the Commonwealth). Questions of statutory construction present pure questions of law. *Commonwealth v. Ramos*, 83 A.3d 86, 90 (Pa. 2013). If the Commonwealth is correct, the second question is whether that reading necessarily renders Section 508(a)(1) unconstitutional under *Garner*, another legal question. *See Commonwealth v. Bell,* 211 A.3d 761, 765 (Pa. 2019) ("'Whether § 1547(e) of the Vehicle Code, 75 Pa.C.S. § 1547(e), is violative of . . . the Fourth Amendment to the United States Constitution' . . . [is] a question of law."). An appellate court's assessment of those abstract questions will not turn upon, or even benefit from, case-specific factual determinations.

The final component of the Commonwealth's merits argument addresses the remedy for the alleged constitutional defect. According to the Commonwealth, "[t]his Court can correct the unconstitutional aspects of Section 508(a)(1)" by interpreting it in a way that "would limit the use of deadly force to forcible felons fleeing with a deadly weapon while requiring some additional indicia that they will cause death or serious bodily injury." Commonwealth's Br. at 34, 37. The propriety of this proposed fix turns upon whether it cures the alleged constitutional defect, and, more fundamentally, whether a court is empowered to impose it, given the Commonwealth's view that certain portions of Section 508(a)(1) are unambiguously unconstitutional.[7] The adequacy and feasibility of a remedy also are questions of law. *See Commonwealth v. Batts*, 66 A.3d 286, 293 (Pa. 2013)

---

[7] *Cf. Seila Law LLC v. Consumer Fin. Prot. Bureau*, ___ U.S. ____, 140 S.Ct. 2183, 2207 (2020) ("Constitutional avoidance is not a license to rewrite Congress's work to say whatever the Constitution needs it to say in a given situation.").

(observing that a question as to the appropriate remedy for a violation of the Eighth Amendment is a matter of law).

Thus, the Commonwealth's claim is analytically distinct from the main questions in this case—that is, whether the Commonwealth's factual allegations are true, and whether those facts support a conviction for third-degree murder, recklessly endangering another person, and/or possession of an instrument of crime. Whether the Commonwealth can prove that Pownall fired the bullet that killed Jones, or that Pownall even possessed a firearm for that matter, has no bearing upon our ability to determine the meaning of Section 508(a)(1), whether it is unconstitutional, and, if it is, how to remedy the constitutional defect.

This view is consistent with our decisions in civil cases holding that pretrial orders implicating the meaning and breadth of a statutory defense are separable from the main cause of action. In one of our foundational separability decisions, *Pridgen*, we held that a challenge concerning the availability of a defense arising under the federal General Aviation Revitalization Act ("GARA"), 49 U.S.C. § 40101, was separable from the main issue, which dealt with a manufacturer's exposure in a products liability suit. GARA contains a statute of repose that precludes tort liability for manufacturers of aircraft components more than eighteen years after installation of the aircraft parts. The issue raised on interlocutory appeal concerned "the scope of an original manufacturer's ongoing liability under GARA . . . for the alleged failure of replacement parts that [the appellant] did not physically manufacture." *Pridgen*, 905 A.2d at 432. The appellants contended that the issue was separable from the main cause of action because the facts necessary to determine the general scope of liability "(the age of an aircraft and the date of its first sale) [are] separate from and collateral to the underlying controversy in aviation tort litigation." *Id.* at 429. We agreed, explaining:

> [T]he issue that Appellants seek to raise on appeal concerning the application of the [time bar] to the original manufacturer and type certificate holder is both conceptually and factually distinct from the merits of Appellees' underlying product liability causes of action. Again, to resolve the legal claim presented, an appellate court's frame of reference will be centered on the terms of GARA, not on determinations of fact or the scope of Appellants' liability in the first instance.

*Id.* at 433.

More recently, in *Brooks*, we considered whether an order rejecting a defendant's invocation of the Sovereign Immunity Act, 42 Pa.C.S. §§ 8521-8527, in a negligence action satisfies all three prongs of the collateral order doctrine. More specifically, the issue was whether the defendant "was a 'Commonwealth party' subject to the Sovereign Immunity Act's waiver of immunity." *Brooks*, 259 A.3d at 372. In finding that the issue was separable from the main cause of action, we explained that the "issue is a purely legal question that can be resolved by focusing on the Act and does not necessitate an examination of the merits of [the plaintiff's] negligence claim." *Id.*

The contested orders in *Pridgen* and *Brooks* also affected the resolution of the ultimate issue in those cases, just as the resolution of the Commonwealth's claim here might affect the outcome of this case. A ruling adverse to the party raising the defense in those cases would have, "quite literally, result[ed] in an after-the-fact judicial alteration" of the scope of that party's potential liability. Maj. Op. at 28. Despite that possibility, we held in each case that the claim was separable from the main cause of action. Those rulings should bind us to the same ruling here. The Majority hardly pays lip service to these important cases, let alone follows in their compelling footsteps. As in *Pridgen* and *Brooks*, the questions raised by the contested order in this case—the meaning of Section 508(a)(1), its constitutionality, and the feasibility of the Commonwealth's proposed remedy—are "purely legal question[s] that can be resolved by focusing on" Section 508(a)(1), and do not "necessitate an examination of" Pownall's guilt or innocence. *Brooks*, 259 A.3d at 372; *see Pridgen*, 905 A.2d at 433 ("Again, to resolve the legal claim

presented, an appellate court's frame of reference will be centered on the terms of GARA, not on determinations of fact or the scope of Appellants' liability in the first instance.").

The only distinction I discern between the circumstances before us and those in *Pridgen* and *Brooks* is that those cases involved immunity-type defenses, which, unlike justification defenses, aim to exempt the individuals entitled to immunity from the burden of being haled into court and defending themselves in the first place. But that distinction matters only for purposes of the irreparable-loss prong.[8] As far as separability goes, I fail to see how the immunity defenses at issue in *Pridgen* and *Brooks* differ in any meaningful way from the justification defense at issue here. There is no principled distinction between the inquiry in those cases and questions concerning the meaning and constitutionality of a statutory defense in a criminal prosecution.[9]

Notably, the Supreme Court of the United States has addressed the constitutionality of a police-officer's use of force on interlocutory appeal pursuant to the collateral order doctrine. In *Plumhoff v. Rickard*, the Court considered whether police officers' claims of qualified immunity based upon the contention that their "conduct did not

---

[8]      *See Pridgen*, 905 A.2d at 433 ("[T]he substantial cost that Appellants will incur in defending this complex litigation at a trial on the merits comprises a sufficient loss to support allowing interlocutory appellate review as of right, in light of the clear federal policy to contain such costs in the public interest."); *Brooks*, 259 A.3d at 373 ("Because sovereign immunity protects government entities from a lawsuit itself, we conclude that a sovereign immunity defense is irreparably lost if appellate review of an adverse decision on sovereign immunity is postponed until after final judgment.").

[9]      In an attempt to deprive *Pridgen* and *Brooks* of their salience here, the Majority clings to the fact that those cases addressed civil appeals involving immunity-type defenses. Maj. Op. at 30 n.18. But, as to separability, the distinction is without a difference. The fact that immunity defenses aim to prevent a defendant from being haled into court matters only for purposes of irreparable loss. For purposes of separability, there is no meaningful distinction between justification defenses in criminal cases and immunity-type defenses in civil cases. Both types of defenses bear directly upon the likelihood that the defendant will be held liable (whether criminally or civilly) for the alleged conduct.

violate the Fourth Amendment and, in any event, did not violate clearly established law" was separable from the main cause of action in a case brought under 42 U.S.C. § 1983. *Plumhoff*, 572 U.S. at 773. Holding that the challenged order was collateral, the *Plumhoff* Court explained that the constitutional issues "are quite different from any purely factual issues that the trial court might confront if the case were tried; deciding legal issues of this sort is a core responsibility of appellate courts, and requiring appellate courts to decide such issues is not an undue burden." *Id.* at 772, 773. Once again, the Majority does not address this case substantively, nor even acknowledge the patent similarities between it and the instant dispute. I see no reason why our view of separability should be any different in this case. This appeal poses the abstract question of whether a statute is unconstitutional. Indeed, the issue we face is a question of law entirely unadulterated by facts, more so than the one that the *Plumhoff* Court confronted, which asked whether the alleged facts demonstrated that the police officer's use of force was unconstitutional.[10]

Undoubtedly, the constitutional and interpretive questions raised by the Commonwealth bear directly upon the likelihood that Pownall will be convicted of the crimes charged; however, that is not enough to defeat separability. *See Johnson*, 515

---

[10]    The Majority maintains that further factual development is needed to assess the Commonwealth's constitutional challenge. To that end, my colleagues take note of the Supreme Court's holding that, "in use-of-force cases the 'first step in assessing the constitutionality of [an officer's] actions is to determine the relevant facts.'" Maj. Op. at 31-32 (alterations in original) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)). By characterizing the Commonwealth's position as a challenge to the constitutionality of Pownall's conduct, the Majority assumes (incorrectly) what it seeks to prove. Of course, it would be impossible to assess the constitutionality of Pownall's conduct without factual findings or allegations. But the Commonwealth's constitutional argument has nothing to do with what Pownall did or is alleged to have done. Rather, the constitutional challenge turns upon the terms of Section 508(a)(1). *See* Commonwealth's Br. at 24 ("Section 508(a)(1) does not meet these basic Fourth Amendment requirements, both because (1) it permits the use of deadly force in situations where such force is not necessary to prevent death or serious bodily injury; and (2) it does not require the factfinder to consider the objective reasonableness of the officer's actions.").

U.S. at 314 ("[A]lthough sometimes practically intertwined with the merits, a claim of immunity nonetheless raises a question that is significantly different from the questions underlying plaintiff's claim on the merits (*i.e.*, in the absence of qualified immunity).").  The salient question is not whether an appellate court's resolution of the issue will affect the ultimate outcome of the case.  Rather, it is whether the constitutional claim can be analyzed without considering whether Pownall in fact acted as the Commonwealth alleges.  And here it clearly can be so analyzed.  Accordingly, the merits of the Commonwealth's appeal are separable from Pownall's potential guilt or innocence.

The remaining prongs of Rule 313's collateral order doctrine are satisfied here as well.  The Commonwealth has demonstrated irreparable loss because this appeal is its one and only opportunity to secure appellate review of its challenge to Section 508.  If the jury acquits Pownall, double jeopardy precludes the Commonwealth from seeking appellate review of the challenge to Section 508(a)(1).  *See Gibbons*, 784 A.2d at 778; *Commonwealth v. Blystone*, 119 A.3d 306, 313 (Pa. 2015) (Eakin, J., concurring) ("As the Commonwealth cannot appeal once the jury has returned its verdict, appellate review would be foreclosed and the right would indeed be irreparably lost.").  Conversely, if the jury convicts Pownall notwithstanding the trial court's denial of the Commonwealth's challenge, then the Commonwealth would not be an aggrieved party entitled to challenge the denial on appeal.  *Polo*, 759 A.2d at 373 n.1.  Put simply, regardless of how Pownall's bell tolls, on this question that bell "cannot be unrung by a later appeal."  *Harris*, 32 A.3d at 249.

I also am convinced that the challenge to Section 508(a)(1) raises an important question of great concern to the public.  This appeal asks whether the General Assembly effectively has immunized police officers to commit homicide under circumstances that violate the Fourth Amendment.  Our answer to that question reaches far beyond this case.

It lets citizens know whether their conduct during an arrest could place their lives in jeopardy. It also puts law enforcement officers on notice of what conduct is or is not lawful, so that they can perform their duties without fear of criminal or civil liability. Because the Majority leaves these important questions unanswered and potentially *unanswerable*, the status quo remains decisively in favor of a deadly force justification, one as to which serious constitutional questions have been raised.

To be sure, the collateral order doctrine does not lend itself to crystal-clear, brightline standards. The doctrine's inherent flexibility prevents the Majority's approach from appearing unreasonable. Murky standards are not, however, an invitation to disregard first principles. The practical motivations of the final judgment rule must guide us through the turbidity. In my view, the Majority's decision to apply the final judgment rule is untethered to any of the rule's concerns.[11]

This is not a case where further development of the record would enrich our assessment. The Commonwealth presents a purely legal question, the answer to which does not require evidentiary rulings or findings of fact. For that same reason, the Commonwealth's challenge is not a matter within the primary domain or discretion of a trial court. Such matters are the heart of an appellate court's work. And the Majority's analysis of the separability prong is particularly inconsistent with that prong's animating principle, which is to limit the number of times a reviewing court must consider issues that are nearly identical. We are asked to decide a constitutional question that will remain unanswered if we do not assess it here and now. If we were to decide this matter, there would be no need for this Court or the Superior Court to consider it again, here or in any other case. The Majority's insistence upon an overly formalistic application of the final

---

[11]    *See Shearer*, 177 A.3d at 855 ("Considering issues only after a final order maintains distinctions between trial and appellate review, respects the traditional role of the trial judge, and promotes formality, completeness, and efficiency.").

judgment rule leaves the important questions implicated in this case unanswered, not just today but perhaps indefinitely.

This appeal satisfies all three prongs of the collateral order doctrine. To hold otherwise is to elevate formalism over pragmatism. Accordingly, I would proceed to address the merits of the Commonwealth's claim that Section 508(a)(1), as written, is unconstitutional under the United States Supreme Court's decision in *Tennessee v. Garner.*

## II. Merits

*Garner* was the first occasion upon which the Supreme Court considered the constitutional implications of the use of deadly force in effectuating an arrest. That case began when Tennessee police officer Elton Hymon responded to a report of a burglary in a Memphis neighborhood. As Hymon was searching the exterior of the residence where the crime reportedly occurred, he heard a door slam shut in the back of the house. When Hymon entered the backyard, he saw a small individual, fifteen-year-old Edward Garner, darting across the yard and toward a chain link fence, stopping just a few feet away. Hymon ordered him to halt, but Garner proceeded to climb the fence. At that point, Hymon, who was "reasonably sure" that Garner was unarmed, shot Garner in the back of the head. *Garner*, 471 U.S. at 3. Garner died shortly thereafter.

Tennessee's use-of-force statute codified the then-prevailing common law rule, which provided that police officers may shoot any fleeing felon to prevent an escape. Thus, Hymon's conduct was statutorily permitted. The Supreme Court addressed whether state laws authorizing the use of deadly force against fleeing, unarmed, and non-violent felony suspects were unconstitutional.

The *Garner* Court's analysis began with the pronouncement that "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the

Fourth Amendment."[12]  *Id.* at 7.  As such, the Court employed the same basic analytical framework applicable in all Fourth Amendment cases—that is, whether the intrusiveness of the seizure is justified by the governmental interest underlying it.  Unlike other encroachments within the domain of the Fourth Amendment, however, "[t]he intrusiveness of a seizure by means of deadly force is unmatched."  *Id.* at 9.  Only a comparably unrivaled state interest could justify such an intrusion.  For that reason, the Court rejected the contention that the government's interest in effective law enforcement justified killing a suspect.  "The use of deadly force is a self-defeating way of apprehending a suspect and so setting the criminal justice mechanism in motion.  If successful, it guarantees that that mechanism will not be set in motion."  *Id.* at 10.  The Court held that statutory provisions like Tennessee's are unconstitutional to the extent that they authorize the use of lethal force for the sole purpose of effectuating an arrest.  *Id.* at 11 ("The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable.").

But the *Garner* Court stopped short of declaring the statute facially unconstitutional, because there are circumstances in which it might be reasonable to kill a fleeing felon.  The lone governmental interest of sufficient weight, the Court decided, was the need to protect the life of another.  "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."  *Id.* at 11.  "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly

---

[12]  *See also Torres v. Madrid,* ___ U.S. ___, 141 S.Ct. 989, 1003 (2021) (holding that officers seized fleeing suspect the instant they shot her, although she eluded capture).

force to do so." *Id.* From these general principles, the Court articulated the following clear standard:

> [I]f the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Id.* at 11-12.

The Court laid down what seemed to be a rigid three-part standard for assessing a police officer's use of deadly force. That test asks whether: (1) the suspect poses an immediate threat of death or serious physical harm to the officer or others; (2) the use of deadly force is necessary to prevent the suspect from escaping; and (3) where feasible, the officer has warned the suspect that he intends to use lethal force. Despite the *Garner* Court's manifest distaste for extrajudicial killings by state actors,[13] and despite its effort to establish a highly limited set of circumstances where such killings were permissible,[14]

---

[13]     Capital punishment is the only other context where state-sanctioned killings are constitutional. The federal Constitution imposes much stronger *ex ante* restraints on the imposition of the death penalty than it does on a police officer's use of lethal force. Consider that the Supreme Court has held that murder is the only crime against a person that can warrant imposition of the death penalty. *See Kennedy v. Louisiana*, 554 U.S. 407, 437 (2008) ("As it relates to crimes against individuals, though, the death penalty should not be expanded to instances where the victim's life was not taken."). *Garner*, conversely, allows state actors to kill based upon a much wider range of crimes, so-called dangerous felonies. Moreover, the imposition of capital punishment for murder is constitutional only if the government has adhered to the most rigid and robust procedural constraints, such as bifurcation of the guilt and penalty phases. Capital trials are unparalleled in the protections that they afford to the accused before his or her life is taken. Nonetheless, for whatever reason, the High Court has determined that a fleeing suspect is not entitled to remotely similar safeguards when a police officer decides to kill the suspect. Indeed, *Garner* and its progeny require only probable cause despite the fact that the penalty even for relatively minor offenses such as criminal trespass, which, if graded as a second-degree felony carries a maximum prison sentence of ten years requires proof beyond a reasonable doubt.

[14]     *See Garner*, 471 U.S. at 14 (denouncing the notion that all fleeing felons have "already forfeited" their lives).

subsequent Supreme Court decisions blurred the parameters of *Garner*'s clear test. The Supreme Court's decision in *Scott v. Harris*, 550 U.S. 372 (2007) is the most prominent among these cases.

In *Scott*, the Court rejected any suggestion that *Garner* established "a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.'" 550 U.S. at 382. Instead of adhering to the clarity that the *Garner* factors provided to the bench, the bar, and law enforcement, the *Scott* Court favored an amorphous standard bounded only by a particular reviewing court's subjective view as to whether a particular police officer's "actions were reasonable." *Id.* at 383. The Court added no real content to this "reasonableness" inquiry, aside from reiterating that, as in any Fourth Amendment case, "we must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* (cleaned up). What this really means is that, except in the clearest of cases, courts have to "slosh . . . through the factbound morass of 'reasonableness.'" *Id.*

Notwithstanding the *Scott* Court's weakening of *Garner*, the use of lethal force—meaning force that poses a "near *certainty* of death," *id.* at 384 (emphasis in original)—still can produce an obvious constitutional violation. *Garner*'s general principle that lethal force is justified only when the officer reasonably believes it is necessary to protect himself or others from serious physical harm is still good law. *See Brosseau v. Haugen*, 543 U.S. 194, 197-98 (2004). Categorically, then, the Fourth Amendment prohibits police conduct that poses a near certainty of killing the suspect where nothing demonstrates that the suspect poses a real and present danger to the life or physical well-being of the officer or others. *See Jefferson v. Lias*, 21 F.4th 74, 81 (3d Cir. 2021) (explaining that "[a] passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect")

(citation omitted); *cf. Scott*, 550 U.S. at 386 ("A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death.").

Applying what remains of *Garner*, I agree with the Commonwealth that Section 508(a)(1) is, at least in part, constitutionally defective. The Majority interprets Section 508(a)(1) as providing

> four circumstances in which a police officer's use of deadly force while making an arrest is justified. First, when the officer reasonably believes "such force is necessary to prevent death or serious bodily injury to himself or such other person[.]" 18 Pa.C.S. § 508(a)(1). Second, when the officer reasonably believes "such force is necessary to prevent the arrest from being defeated by resistance or escape" and "the person to be arrested has committed or attempted a forcible felony[.]" *Id.* at (a)(1)(i)-(ii). Third, when the officer reasonably believes "such force is necessary to prevent the arrest from being defeated by resistance or escape" and "the person to be arrested . . . is attempting to escape and possesses a deadly weapon[.]" *Id.* And fourth, when the officer reasonably believes "such force is necessary to prevent the arrest from being defeated by resistance or escape" and "the person to be arrested . . . indicates that he will endanger human life or inflict serious bodily injury unless arrested without delay[.]" *Id.*

Maj. Op. at 5-6 (alterations in original; footnote omitted; and citation modified). The Commonwealth asserts that the second ("forcible felony justification") and third ("deadly weapon justification") of those four scenarios are unconstitutional because they permit an officer to kill a fleeing suspect without any indicia that the suspect will harm the officer or others.[15]

---

[15] The Majority offers just one reasonable interpretation. Section 508(a)(1) also could be interpreted such that "possesses a deadly weapon" not only modifies "is attempting to escape" but also the phrase "has committed or attempted a forcible felony." If the possession requirement modifies the forcible felony requirement as well, then the "forcible felony" justification would require proof that the person to be arrested both (1) has committed or attempted to commit a forcible felony and (2) possesses a deadly weapon. As a result, the "deadly weapon justification" would be a bit of a misnomer and could be

The first and fourth circumstances conform with the requirements of *Garner* and its progeny. The first situation conditions the justification defense upon proof of the officer's reasonable belief that deadly force is necessary to prevent death or serious bodily injury to the officer or another. The fourth situation, which provides a catch-all that covers scenarios not involving either a forcible felony or possession of a deadly weapon, is almost entirely redundant of the first, except that, in addition to the requirement that the suspect will endanger human life or inflict serious bodily injury, the officer must also believe that the force is necessary to prevent the suspect from defeating the arrest. These two are the only situations that adequately accommodate *Garner*'s core principle: that the use of lethal force is constitutional when there are at least *some* facts reasonably supporting the conclusion that the person to be arrested presents a danger to the life or limb of another. *See Garner*, 471 U.S. at 11 ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."); *cf. Plumhoff*, 572 U.S. at 777 (holding that an officer acted reasonably when he fatally shot a fleeing suspect whose conduct while in flight "pose[d] a deadly threat for others").

Conversely, the two challenged portions of Section 508(a)(1)—the forcible felony and deadly weapon justifications—permit an officer to kill a fleeing suspect without any

retitled the "attempted escape" justification, which requires an attempted escape and possession of a deadly weapon.

These competing interpretations provide further reason why we should address the merits here and now. If the Majority's reading is incorrect, the suggested jury instruction for Section 508, which is likely used by many courts throughout this Commonwealth, also is incorrect. Alas, my learned colleagues side-step this important question, refusing to provide guidance as to how or when it will be possible to address it.

For purposes of this analysis, I accept the Majority's proffered interpretation. But regardless of which reading is superior, both constructions are unconstitutional because they permit the use of lethal force without any facts indicating the suspect poses an immediate danger.

facts demonstrating that the suspect poses an actual threat of death or grave bodily injury to the officer of others. The deadly weapon provision deems a suspect's flight plus the mere possession of a deadly weapon as sufficient in and of themselves to justify lethal force. The forcible felony justification permits an officer to use deadly force based upon the suspicion of a past crime involving violence, regardless of whether the officer has any reason to believe that the fleeing suspect will harm someone if not apprehended immediately. There is no constitutional situation in which the bare fact that the fleeing suspect possesses a weapon or may have committed a violent crime at some point in the past justifies the use of deadly force. *See Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016) (holding that "the mere presence of a gun or other weapon is not enough to warrant the exercise of deadly force"); *Jefferson*, 21 F.4th at 81; *cf. Stewart v. City of Euclid*, 970 F.3d 667, 673 (6th Cir. 2020) (holding that the totality of circumstances did not justify police officer's use of deadly force against motorist, even though motorist drove into police car at beginning of encounter).

Rather, the Fourth Amendment requires some further indication that the suspect will harm the officer or another. *Cf. Abraham v. Raso*, 183 F.3d 279, 295 (3d Cir. 1999) (explaining that past dangerousness does "not necessarily justify continuing to use lethal force"). And, if the officer possessed such additional indicia of dangerousness, he would be availing himself of either the first or fourth situations contemplated in Section 508(a)(1), not the forcible felony or deadly weapon justification alone. As the Commonwealth argues, the General Assembly's use of the disjunctive "or" to separate Section 508(a)(1)'s four scenarios has created independent exceptions.[16] Section 508(a)(1) declares

---

[16] *See* Commonwealth's Br. at 34 ("The two impermissible scenarios of the escape justification contain nothing more than 'rigid preconditions,' a checkmark beside each of which will permit an officer to take the suspect's life, without any consideration of the objective reasonableness of that action. For this reason, too, the statute permits the use of deadly force in situations that violate a person's constitutional rights."); *id.* at 24

unambiguously that the presence of a deadly weapon or the reasonable belief that the fleeing suspect committed a forcible felony is enough *per se* to justify a police officer's use of deadly force. However, deadly force is constitutional only if the totality of the circumstances supports a reasonable belief that the fleeing suspect poses a risk of real harm to the officer or others. Because the deadly weapon and forcible felony justifications permit an officer to use lethal force based upon a single fact, without consideration of whether the force was reasonable under the totality of the circumstances, those provisions are unconstitutional. There is no constitutional situation in which mere possession of a deadly weapon or suspicion of a crime, without more, can permit the use of lethal force. For that reason, I would strike those provisions.

The first and fourth circumstances listed in Section 508(a)(1) comply with the requirements of the Fourth Amendment. They also are entirely severable from the unconstitutional portions. The first and fourth justification defenses are not "so essentially and inseparably connected with, and so dependent upon," the deadly weapon and forcible felony justifications "that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one[s]." 1 Pa.C.S. § 1925. Nor would I conclude that "the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent." *Id.* The second and third circumstances in Section 508(a)(1) should be severed from the constitutional portions. *See, e.g.*, *Commonwealth v. Hopkins*, 117 A.3d 247, 252 (Pa. 2015) ("[E]ven if certain provisions of a statute are deemed to run afoul of the federal or state Constitution,

---

("Section 508(a)(1) does not meet these basic Fourth Amendment requirements, both because (1) it permits the use of deadly force in situations where such force is not necessary to prevent death or serious bodily injury; and (2) it does not require the factfinder to consider the objective reasonableness of the officer's actions.").

portions of the statute which are not so offensive may retain their viability through judicial severing of those sections from the sections that are unconstitutional.").

The Commonwealth agrees that "[a] disjunctive interpretation of Section 508(a)(1)(ii) unquestionably infringes on Fourth Amendment rights established by the United States Supreme Court," but it asserts that, instead of removing the two offending justifications, we should reinterpret Section 508(a)(1) by replacing its several uses of "or" with the conjunctive "and." Commonwealth's Br. at 36-37. Under that construction, lethal force would be permitted only when the officer reasonably believes the fleeing suspect has committed or attempted to commit a forcible felony **and** possesses a deadly weapon, **and** otherwise indicates that he will endanger human life or inflict serious bodily injury unless arrested without delay.

That argument asks us for something that we cannot do. We possess no magic wand that would allow us simply to remake "or" to mean "and." Because "or" is disjunctive, the statute unambiguously entitles a law enforcement officer to use lethal force if he demonstrates any of Section 508(a)(1)'s four circumstances. In certain instances, the use of a disjunctive when describing conditions that would trigger an event does not preclude that same event from occurring when those same conditions occur conjunctively. But a disjunctive set of prerequisites can never mean that all those conditions must occur in order for the event to occur.[17] Consider the following sentence: If Andy takes out the trash **or** does the dishes, Brenda will walk the dog. If Andy takes out the trash, then Brenda will walk the dog. If Andy does the dishes, Brenda will walk the dog. If Andy does the dishes **and** takes out the trash, then Brenda still must walk the dog. But under no reasonable interpretation is Andy **required** both to do the dishes **and**

---

[17] *See generally* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 116-25 (2012) (explaining the conjunctive/disjunctive canon).

to take out the trash before Brenda will walk the dog. The word "or" does not preclude multiple listed conditions from triggering an event, but there is no reasonable construction of "or" that requires multiple conditions. Put simply, three conditions conjoined by an "or" are alternatives, not three prongs or elements.

Thus, Section 508(a)(1) in no conceivable way conditions its justification defense upon the presence of a gun, suspicion of a dangerous felony, *and* some other indicia of dangerousness. The General Assembly unambiguously has declared that a police officer can kill a fleeing suspect based upon the officer's belief that the suspect possesses a weapon, or upon the officer's belief that the suspect committed a forcible felony, or if the fleeing suspect otherwise indicates he will seriously harm or take the life of someone. By treating the final scenario—other indicia of dangerousness—as its own distinct exception, Section 508 declares that a fleeing suspect's possession of a weapon or past commission of a dangerous felony are proxies for the reasonable belief that the suspect poses an immediate threat of serious physical harm. But, as the *Scott* Court made clear, there is no "magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.'" *Scott*, 550 U.S. at 382. Thus, Section 508(a)(1)'s forcible felony and deadly weapon justifications are unambiguously unconstitutional. Because we have no license to rewrite them, they must be stricken. *Seila Law LLC*, 140 S. Ct. at 2207 ("Constitutional avoidance is not a license to rewrite [the legislature's] work to say whatever the Constitution needs it to say in a given situation.").

The final question in this case asks whether Pownall can be denied the opportunity to invoke the unconstitutional portions of Section 508(a)(1). Pownall asserts that a judicial ruling that alters Section 508 or that invalidates it in part amounts to an unconstitutional

*ex post facto* law.[18] Despite the patent unconstitutionality of the statute, I firmly agree that Pownall cannot be denied its benefit. To deprive Pownall of the opportunity to invoke the deadly weapon or forcible felony justifications at his trial would be to "expand[ ] the scope of a criminal prohibition after the act is done." *Collins v. Youngblood*, 497 U.S. 37, 49 (1990); *see also Beazell v. Ohio*, 269 U.S. 167, 169 (1925) (a law is *ex post facto* if it "deprives one charged with [a] crime of any defense available according to law at the time when the act was committed"). This is plainly forbidden by our Constitutions. To expose Pownall to a higher probability of criminal sanction than what he faced at the time of the alleged acts would violate the constitutional proscriptions on *ex post facto* laws.

In sum, our Constitutions favor trials over summary executions, and they value the lives of suspects who carry deadly weapons just as much as the lives of the unarmed. By justifying the use of deadly force on suspicions of criminal conduct, regardless of whether the suspect actually poses a threat, Section 508(a)(1) impermissibly grants police officers the power of judge, jury, and executioner. It improperly treats possession of a weapon as a proxy for dangerousness. *Cf. Commonwealth v. Hicks*, 208 A.3d 916, 947 (Pa. 2019) (characterizing the lower court's view "that the 'possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous'" as patent error). I agree with the Commonwealth that Section 508(a)(1) is unconstitutional. But the canon of constitutional avoidance is no savior here. We should strike the offending provisions. Nonetheless, if Pownall presents

---

[18] The United States Constitution contains two provisions addressing *ex post facto* laws. The first is found in Article I, Section 9, and serves as a limitation on Congress' authority to pass such laws: "No Bill of Attainder or ex post facto Law shall be passed." U.S. CONST. art. I, § 9, cl. 3. The proscription appears for the second time in Article I, Section 10, and, in this usage, constitutes a restriction on the power of the states: "No State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility." U.S. CONST. art. I, § 10, cl. 1. Article I, Section 17 of the Pennsylvania Constitution similarly limits the General Assembly's power: "No ex post facto law . . . shall be passed." PA. CONST. art I, § 17.

facts that warrant application of any or all of the provisions of Section 508(a)(1), he is entitled to a jury instruction that reflects the language of Section 508(a)(1) as it existed at the time of the alleged offense because the retroactive deprivation of a statutory justification would itself result in a constitutional violation.

All of these issues are separable from Pownall's guilt or innocence. We are presented with purely legal questions that do not hinge upon the veracity or adequacy of the Commonwealth's factual allegations. The result of the Majority's contrary conclusion is that these constitutional issues of statewide significance are likely to evade our review forever. And the Commonwealth certainly will not be able to have them answered during any appeal that follows Pownall's trial. Because the Majority errs in concluding that the collateral order doctrine does not allow us to answer these important questions, I dissent.

Justice Donohue joins this dissenting opinion.